# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Advanced Mold Diagnostics, LLC,   :
                           Petitioner   :
                                   :
                    v.             :   No. 908 C.D. 2019
                                 :   Submitted: February 10, 2020
Unemployment Compensation Board   :
of Review,                       :
                   Respondent   :

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, Judge
                 HONORABLE P. KEVIN BROBSON, Judge
                 HONORABLE J. ANDREW CROMPTON, Judge

**OPINION NOT REPORTED**

**MEMORANDUM OPINION BY**
**JUDGE COHN JUBELIRER**               **FILED: February 28, 2020**

Advanced Mold Diagnostics, LLC (Employer) petitions for review of an Order of the Unemployment Compensation (UC) Board of Review (Board) dated June 21, 2019, which reversed the decision of the Referee and determined that Marita Belotti (Claimant) was not ineligible to receive UC benefits pursuant to Section 402(b) and (e) of the UC Law (Law).[1] On appeal, Employer argues that the Referee's initial decision, finding Claimant ineligible to receive UC benefits on the basis of willful misconduct pursuant to Section 402(e), was correct. Should the Court hold

---

[1] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 802(b) (providing that a claimant is ineligible to receive UC benefits for "unemployment [that] is due to voluntarily leaving work without cause of a necessitous and compelling nature"), (e) (providing that a claimant is ineligible to receive UC benefits for "unemployment [that] is due to [] discharge or temporary suspension from work for willful misconduct").

that Claimant is not ineligible under Section 402(e), Employer argues that Claimant would be ineligible to receive UC benefits pursuant to Section 402(b) of the Law because she voluntarily quit her position without a necessitous and compelling reason. Because Employer's actions and statements to Claimant possessed the "immediacy and finality" of a termination, *Bell v. Unemployment Compensation Board of Review*, 921 A.2d 23, 26 (Pa. Cmwlth. 2007), we need not address whether Claimant voluntarily quit. Further, because Employer does not challenge the Board's finding that there was a lack of evidence of insubordination, Employer has not met its burden of demonstrating Claimant engaged in willful misconduct. Accordingly, we affirm.

## I.      Factual Background and Procedure

### A.      Claimant's UC Application

Claimant worked as an office manager/executive assistant for Employer from October 8, 2018, until January 25, 2019. Thereafter, Claimant filed for UC benefits. UC authorities then requested information from both Claimant and Employer. In her "Claimant Questionnaire," Claimant indicated that she was discharged from her job with Employer on January 25, 2019, and that her discharge was not a result of insubordination. (Certified Record (C.R.) Item 2.) In its "Request for Separation and Wage Information," Employer indicated Claimant's reason for separation was "[m]isconduct." (*Id.*, Item 3.) Further, in its "Employer Questionnaire," Employer indicated Claimant was discharged due to "an [a]ct of [i]nsubordination" and because Claimant "[r]efused to [c]omply with Employer's [o]rder or [r]equest." (*Id.*) In neither its "Request for Separation and Wage Information" nor its "Employer Questionnaire" did Employer indicate that Claimant voluntarily quit.

Based upon this information, the Altoona UC Service Center issued a Notice of Determination finding Claimant was ineligible to receive UC benefits pursuant to Section 402(e) of the Law because Claimant was discharged for insubordination and did not demonstrate good cause for her insubordination. Claimant timely appealed.

### B.      Referee's Decision

The Referee conducted two hearings on Claimant's appeal, one on March 14, 2019, and a second on April 1, 2019. At the initial hearing, Employer's General Manager, Owner, and Claimant testified. Because the parties had additional evidence to present, the Referee continued the hearing to a second day. At the second hearing, General Manager, Owner, and Claimant again testified and responded to questions from the Referee. In addition, Employer's former Controller testified on Claimant's behalf, and Employer presented a video of the January 25, 2019, incident.

General Manager testified at the first hearing, in relevant part, as follows. Claimant's separation from Employer was not a result of discharge. Rather, "[t]here was a series of events which led up to the point [where Claimant] quit" on January 25, 2019, the final event being that Claimant refused to sign a "disciplinary form." (3/14/19 Hearing Transcript at 8.) General Manager stated that Claimant refused to sign the disciplinary form because she did not agree with its contents, to which General Manager told Claimant that she could "simply check the box" on the form indicating that she did not agree with the assertions made therein. (*Id.*) He informed Claimant that "according to [Employer's] policy and procedure manual, which [Claimant] signed that [she had] read," Claimant was required to sign the disciplinary form. (*Id.* at 8-9.) General Manager did not have the policy and

3

procedure manual with him at the hearing but testified that the manual contains a policy requiring employees to "sign[] any documents [] pertaining to the job." (*Id.* at 12-13.) After Claimant refused to sign the form, General Manager informed Claimant that "if you're not going to adhere to company policy, then I have to ask you to leave for today until you decide that you want to adhere." (*Id.* at 8.)

General Manager testified that after he asked Claimant to leave, the following exchange took place:

> [Claimant] said I'm not leaving, I'm not quitting. I said well, I'm not asking you to quit. She said, well, you're going to have to fire me if you want me to leave. I said I'm not firing you. . . . [Claimant] said where's [Owner]? I said, well, [Owner] is on his way in. She said, well, I want to talk to him. I said well, fine. . . . I had to call the Marple Township Police Department, and I said to them, I said she said she wants to wait for [] [O]wner, she's perfectly welcome to go wait in her car, but I'm conducting business at this time and I'd like her to leave the building. She did do that. She left the building. I was under the impression that she said she was going to be waiting. She told the police I'm going to wait in my car to talk to [Owner]. I didn't notice she wasn't waiting in her car until [Owner] did show up. I said, did you see [Claimant] in her car, she's waiting to talk to you. [Owner] said, there's nobody outside. I walked outside and I didn't see [Claimant].

(*Id.* at 9.) General Manager stated that he has not heard or seen Claimant since she exited the building on January 25. (*Id.* at 9-10, 15.) General Manager concluded that "[t]he reason for [Claimant's] separation is because she didn't come back" to work after the incident. (*Id.* at 29.)[2]

Owner testified that he had no firsthand knowledge of the incident because he was not there but that he had reviewed the audio/video recording of the incident. (*Id.*

---

[2] Based upon General Manager's testimony, the Referee sought and obtained permission from the parties to expand the scope of the hearing to consider, not only whether Claimant was discharged, but also whether she voluntarily quit.

4

at 17.) In response to a question by the Referee asking why Claimant was discharged from her job, Owner testified that "[t]here was an incident on Friday, January 25th" and after the incident Claimant "never actually came back to work." (*Id.* at 8.) Owner indicated that he has had no further contact with Claimant since that time. (*Id.* at 17.)

Claimant testified at the first hearing as follows. General Manager asked Claimant to sign the disciplinary form on January 23 and 24 and that, when he asked again on January 25, she informed him that while she would sign a "disciplinary writeup," she would not sign the disciplinary form that General Manager presented because it was inaccurate and "written out of context." (*Id.* at 19.) Claimant testified that during her interaction with General Manager on January 25 she told General Manager that she believed Owner was trying to force her to quit but that she was not quitting and that she needed to speak to Owner. (*Id.* at 20.) As support for her assertion that Owner was trying to force Claimant into quitting, Claimant presented a text message from Owner to Employer's former Controller dated January 14, 2019, which was admitted without objection, stating "[p]lease let me know your availability for extra time this week and going forward until I bring in someone else. [Claimant] will be a bad memory as of tomorrow afternoon." (C.R. Item 8, Claimant's Ex. 1.) Claimant also stated that General Manager took her company cell phone and keys away from her. (3/14/19 Hearing Transcript at 20.) Claimant further testified that after the incident she found out that her "health insurance was already cancel[]ed as of January 24th" and that this evidences that Owner was trying to fire or replace her. (*Id.* at 24.) Claimant also noted that Owner contacted a staffing agency while Claimant was still employed to look for someone to replace her. (*Id.*)

Claimant further testified that after she was escorted from the building by the police on January 25, she waited in her car for 30 to 45 minutes for Owner. (*Id.* at 20.) While waiting, Claimant called Controller who told Claimant that the incident was "grounds for termination" and that Claimant should "go file [for] unemployment." (*Id.* at 21.) Claimant acknowledged that Controller did not have the authority to terminate her. (*Id.* at 22.) Claimant stated that when Owner did not show, she left. (*Id.* at 20-21.)

Specifically, with regard to her separation from Employer, Claimant testified that while "[t]he word fired did not come out of [General Manager's] mouth, [] he took action to lead up to [my] termination." (*Id.* at 18.) Claimant noted that General Manager told her that she "was not allowed to return to work until I signed" the disciplinary form. (*Id.* at 19.) When asked by the Referee whether she "quit for a hostile work environment," Claimant specifically denied the assertion that she quit her job. (*Id.* at 30.)

On rebuttal, Owner admitted to sending the text message to Controller but stated he did not intend on discharging Claimant when he sent the text message. (*Id.* at 32.) Owner also admitted to contacting a staffing agency but stated the intent was "[t]o get [Claimant] support." (*Id.* at 33.) Because Employer wanted to submit video of the incident, the matter was continued to a second hearing.

At the second hearing on April 1, 2019, General Manager presented an approximately seven-minute video of the incident.[3] The video reflects, in relevant part, that General Manager asked Claimant to sign the disciplinary form and, when Claimant refused, General Manager stated "[w]e're not firing [you], but I'm sending

---

[3] The video is a conversation between General Manager and Claimant that occurred on January 25. The conversation was transcribed into the hearing transcript. The video was marked as exhibit 4 and was made part of the supplemental record before this Court.

6

you home until you come back and decide that you're going to follow [Employer's] policies." (4/1/10 Hearing Transcript at 8-9.) Claimant informed General Manager that she believed Owner was not letting her do her job and that while she would sign a form stating she had a verbal discussion with General Manager, she would not sign the disciplinary form because it was not accurate. (*Id.* at 9-11.) General Manager again told Claimant that "[i]f you're not going to follow company procedures, you're not going to be here," and that "if you don't want to follow [the procedures] then you don't want to work here," to which Claimant responded by stating that she does "want to work here." (*Id.* at 11.) General Manager then reiterated that if Claimant would not "sign this sheet, you're not going to work." (*Id.*)

After viewing the video, the Referee asked General Manager why Claimant's company phone and keys were taken from her. General Manager explained that the purpose of the phone was to disseminate timesheets to accounting for purposes of payroll and that after several instances of time being inaccurately recorded, Claimant's company phone was taken from her. (*Id.* at 13.) As to the keys, General Manager explained that Claimant "didn't necessarily need the keys to get in" because the "doors were always open" when Claimant arrived to work. (*Id.*) The Referee also asked General Manager about Claimant's insurance being canceled on January 24. General Manager stated that he was not aware that Claimant's health insurance was canceled. (*Id.* at 14.)

Owner testified, in relevant part, that the fact that Claimant's company phone and keys were taken away had nothing to do with Claimant's separation from employment. (*Id.* at 17.) Owner also testified that Claimant's insurance was not canceled on January 24. (*Id.* at 18.)

7

Employer's former Controller testified on Claimant's behalf, in relevant part, as follows. Controller stated that beginning in October 2018, Owner "had started stating his dissatisfaction that he had overpaid [Claimant], maybe he shouldn't have hired her, how would he be able to get rid of her, would two people replace her." (*Id.* at 23.) Controller further testified that in January 2019, Owner started looking into staffing firms to replace Claimant. (*Id.* at 23-24.) Controller also testified that Owner stated that he was trying "to create a fireable offense [so] that he would not have to pay unemployment" with respect to Claimant. (*Id.* at 25.) During her testimony, Controller stated that Owner's goal was to "try[] to force [Claimant] [] to quit." (*Id.* at 25-26.) Controller stated that the text message Owner sent to her on January 14, 2019, indicated that "[Owner] was going to fire [Claimant], and she would be a distant memory the next day." (*Id.* at 26.)

On rebuttal, Owner admitted to telling Controller that Claimant was overpaid. (*Id.* at 29.) Owner also admitted to contacting staffing firms but stated that he was looking to hire additional help, not to replace Claimant. (*Id.* at 29-30.) However, Owner specifically denied saying he was trying to create a "fireable" offense. (*Id.* at 30.)

After the hearings, the Referee issued a decision finding Claimant ineligible to receive UC benefits pursuant to Section 402(b) of the Law because Claimant did not have a necessitous and compelling reason for voluntarily leaving her employment. (Referee's Decision.) The Referee found that Claimant was asked to sign a disciplinary form and after she refused to sign the form she was escorted from the building where she "waited for up to 45 minutes, then left without speaking to the [Owner]." (*Id.*, Finding of Fact (FOF) ¶ 3.f.) The Referee concluded that "[C]laimant's failure to return to work or contact the [E]mployer after her last day

of work exhibits a conscious intention to leave employment." (*Id.* at 2.) The Referee determined that Claimant did not demonstrate a necessitous and compelling reason for quitting her job, concluding that "[C]laimant did not act with ordinary common sense or make a reasonable effort in maintaining her employment" because she could have signed the disciplinary form "and checked the box showing she disagreed with the" form and continued working. (*Id.* at 3.)

## C. Board's Decision

Claimant subsequently filed a petition for appeal with the Board, which reversed the Referee's decision, concluding that Claimant was not ineligible to receive UC benefits pursuant to either Section 402(b) or (e) of the Law. The Board made the following relevant findings of fact:

2. Starting in October 2018, the [] [O]wner expressed regret for hiring the [C]laimant, described her as overpaid, and inquired how the [E]mployer could get rid of her. On another occasion, the [O]wner stated that he was going to document the [C]laimant's inability to do her job to create a "fireable" offense so he wouldn't have to pay unemployment.

3. In a January 14, 2019 text to the [] [Controller], the [O]wner stated that the [C]laimant "will be a bad memory as of tomorrow afternoon."

4. Beginning on January 23 and 24, 2019, and continuing through January 25, 2019, the [] [G]eneral [M]anager attempted to require the [C]laimant to sign a written warning. The [C]laimant objected to the accuracy of the written warning and refused to sign, although she offered to sign an acknowledgement of a verbal warning.

5. The [G]eneral [M]anager informed the [C]laimant that she could not work, she would have to leave unless she signed the written warning, and he was sending her home until she decided to follow the rules by signing the warning.

9

6. When the [C]laimant refused to leave the building on January 25, the [G]eneral [M]anager contacted the local police, who escorted her from the building. The [G]eneral [M]anager, however, allowed the [C]laimant to wait outside in her car to discuss the matter with the [O]wner, who hadn't arrived yet.

7. The [C]laimant waited in her car for approximately 1/2 hour – 45 minutes, and then went home after the [O]wner did not show up.

8. The [C]laimant later spoke to the [C]ontroller, who informed the [C]laimant that the events of and/or leading up to that day were grounds for termination, and that she should file for unemployment.

9. The [C]laimant thereafter did not return to work.

(Board's Decision, FOF ¶¶ 2-9.) The Board did "not credit the [G]eneral [M]anager's testimony at the first hearing that he only sent the [C]laimant home for the day" in light of the video played at the second hearing because "there was nothing in the recorded conversation qualifying his directive to the [C]laimant]" with respect to sending Claimant home for that day only. (*Id.* at 2.) As such, the Board concluded that "[C]laimant was ordered to leave and eventually escorted off the premises because she refused to sign the written warning." (*Id.* at 2-3.) Therefore, the Board, citing *Maines v. Unemployment Compensation Board of Review*, 532 A.2d 1248, 1251 (Pa. Cmwlth. 1987), determined that Claimant's refusal to sign the disciplinary form "does not amount to a voluntary separation or abandonment of employment" and that Claimant was terminated from her job with Employer. (*Id.* at 3.)

The Board also examined whether Claimant's termination was a result of willful misconduct and determined that it was not. The Board reasoned that while General Manager testified that Employer's policies and procedures manual requires employees to sign documents pertaining to their job, "[t]his paraphrasing, at best, is somewhat vague, and not specific to warning or disciplinary documents." (*Id.*) The

10

Board also noted that "[i]t is not uncommon for employees to refuse to sign disciplinary notices." (*Id.*) Accordingly, the Board determined that Employer did not "adequately establish a violation of a specific rule by the [C]laimant when she refused to sign a written warning for purposes of demonstrating willful misconduct." (*Id.* at 4.)

## II.    Discussion

On appeal to this Court,[4] Employer argues that Claimant is ineligible to receive UC benefits pursuant to either Section 402(b) or (e) and that the Board erred in concluding otherwise. Specifically, Employer contends that "[t]he initial Referee decision was correct in finding that the [Claimant] failed to show good cause for her acts of insubordination under [Section] 402(e)" of the Law. (Employer's Brief (Br.) at 11.) Alternatively, Employer argues that Claimant's separation should be classified as a voluntary quit and that Claimant is ineligible to receive UC benefits because she failed to establish a necessitous and compelling reason for quitting her job with Employer. As support, Employer argues that Claimant

> was not compelled by any supervisor to abandon her position with [Employer]. Rather, after a debate regarding the signing of her disciplinary report, [Claimant] was instructed to wait to discuss the issue with [Owner]. Instead of waiting in the parking lot to speak with [Owner], as she was instructed, [Claimant] left the premises and failed to return. Like the [p]etitioner in *Miller* [*v. Unemployment Compensation Board of Review*, 431 A.2d 1138 (Pa. Cmwlth. 1981)], [Claimant] effectively walked off the job. She did so on her own volition, and did not come back to work in the subsequent days. At no point was [Claimant] instructed that her position was terminated, as

---

[4] "Our review is limited to determining whether the necessary findings of fact were supported by substantial evidence, whether errors of law were committed, or whether constitutional rights were violated." *Johns v. Unemployment Comp. Bd. of Review*, 87 A.3d 1006, 1009 n.2 (Pa. Cmwlth. 2014).

11

[General Manager] did not express an "immediacy and finality" which would lead [Claimant] to reasonably believe that she had been terminated. Similar to the findings of *Miller* and *Yasgur* [*v. Unemployment Compensation Board of Review*, 328 A.2d 908 (Pa. Cmwlth. 1974)], there was no finality of discharge stated to [Claimant] in her exchange with [General Manager].

(*Id.* at 17.)

The Board responds by arguing that it was correct in determining that Claimant was terminated. Specifically, the Board asserts that "Employer discharged Claimant when it ordered Claimant off the premises unless or until she complied with its directive, called the police to escort her out, and refused to contact her thereafter." (Board's Br. at 5.) The Board contends that General Manager's statements to Claimant made it clear that if Claimant would not sign the disciplinary form, "she would be terminated." (*Id.* at 9.) As such, the Board argues that Claimant's separation from Employer was the result of involuntary termination. The Board asserts that since Employer's brief made no arguments with respect to the Board's finding of "a lack of evidence of willful misconduct," the issue of whether Claimant engaged in willful misconduct is waived. (*Id.* at 12.) The Board also argues that Claimant did not voluntarily quit her job with Employer, noting that "Claimant never stated that she quit" and, in fact, stated that she "was ready and willing to continue in her job." (*Id.* at 8.) The Board contests Employer's argument that Claimant was instructed to wait in her car until Owner arrived and that because she left before Owner arrived, she voluntarily quit her job. The Board, citing the testimony of General Manager, asserts that Claimant was granted permission to wait for Owner but was not instructed to wait.

In reviewing this matter, we are guided by the well-established principle that "the Board is the ultimate fact-finder in [UC] matters." *Ductmate Indus., Inc. v.*

12

*Unemployment Comp. Bd. of Review*, 949 A.2d 338, 342 (Pa. Cmwlth. 2008). As such, "as long as the Board's factual findings are supported by substantial evidence, those findings are conclusive on appeal." *Bruce v. Unemployment Comp. Bd. of Review*, 2 A.3d 667, 671 (Pa. Cmwlth. 2010). Additionally, the Board "is empowered to resolve all conflicts in the evidence and to determine the credibility of witnesses." *Procito v. Unemployment Comp. Bd. of Review*, 945 A.2d 261, 262 n.1 (Pa. Cmwlth. 2008).

The crux of this case is whether Claimant was terminated from her job or voluntarily quit. "Whether a claimant's separation from employment was voluntary or a discharge[] is a question of law for this Court to determine by examining the totality of the facts surrounding the termination." *Key v. Unemployment Comp. Bd. of Review*, 687 A.2d 409, 412 (Pa. Cmwlth. 1996). For an employer's action to be considered a discharge, a "claimant must demonstrate that the employer's actions had the immediacy and finality of a 'firing,' but the employer need not specifically use words such as 'fired' or 'discharged.'" *Bell*, 921 A.2d at 26. For a claimant's actions to be considered a voluntary quit, the claimant must have "had a conscious intention to leave employment." *Procyson v. Unemployment Comp. Bd. of Review*, 4 A.3d 1124, 1127 (Pa. Cmwlth. 2010). In determining the intent of the claimant, we must consider "the totality of the circumstances surrounding the incident" in question. *Fekos Enters. v. Unemployment Comp. Bd. of Review*, 776 A.2d 1018, 1021 (Pa. Cmwlth. 2001).

Here, despite indicating in its "Request for Separation and Wage Information" and "Employer Questionnaire" that Claimant was terminated for insubordination, Employer now argues that Claimant was not terminated but voluntarily quit. Specifically, Employer argues that "[a]t no point was [Claimant] instructed that her

13

position was terminated, as [General Manager] did not express an 'immediacy and finality' which would lead [Claimant] to reasonably believe that she had been terminated." (Employer's Br. at 17.) The question then becomes whether General Manager's actions in telling Claimant multiple times that, if she did not sign the disciplinary form, she would not be allowed to work have "the immediacy and finality of a 'firing,'" *Bell*, 921 A.2d at 26. We conclude that General Manager's actions did, and we agree with the Board that the present matter is akin to the facts of *Maines*.

In *Maines*, the claimant "was called to work and ordered to sign a 'counselling report' containing [the e]mployer's version of the events" regarding the claimant's inability to take a driver's examination. 532 A.2d at 1249. The claimant contested "the allegations in the counselling report and refused to sign it. [The e]mployer told [the claimant] that he would not be permitted to continue working unless he signed the report." *Id.* at 1249-50. The claimant did not sign the report and left work. Thereafter, the employer requested the claimant contact the employer "regarding his employment status." *Id.* at 1250. When the claimant contacted his employer, he was again told that he would "have to sign the counselling report or else face discharge." *Id.* When the claimant again refused to sign the report, the employer sent the claimant a letter stating that it "would assume that [he has] abandoned [his] job." *Id.* We concluded that the claimant did not abandon his job by refusing to sign the counselling report or by not returning to work because the claimant "never expressed any desire to leave his employment." *Id.* at 1251. We reasoned that because the "[e]mployer made it abundantly clear that [the claimant] would be discharged unless he acceded to [the e]mployer's order to sign the counselling report," the claimant's conduct "cannot be construed as engaging in conduct that led

14

to his separation." *Id.* As such, we held that claimant was discharged by his employer.

While the facts of the present case are different in that Claimant never received a letter stating her job with Employer would be terminated, Claimant did receive an ultimatum similar to the claimant in *Maines* in that General Manager made it clear to Claimant that if she did not sign the disciplinary form she would not be allowed to work. The video of the incident reflects that, on January 25, 2019, General Manager informed Claimant multiple times that he was sending Claimant home until she decided to follow Employer's policies and procedures by signing the disciplinary form that he prepared. (4/1/19 Hearing Transcript at 8-11.) While General Manager did not specifically state that Claimant would be fired if she did not sign the disciplinary form, and, in fact told Claimant more than once that he was not firing her, General Manager made it clear that if she did not sign the form, Claimant would not be allowed to work. Although General Manager testified that he was only sending Claimant home for the day, the Board did not credit this testimony. (Board's Order at 2.) We are bound by this credibility determination. *Procito*, 945 A.2d at 262. Thus, based on the Board's findings, we agree with the Board that General Manager's statements and actions demonstrate "the immediacy and finality" of a termination, even in the absence of language such as "fired" or "discharged." *Bell*, 921 A.2d at 26.

That Claimant understood she was terminated, and did not voluntarily quit, is supported by the record. At the March 14, 2019 hearing, Claimant testified that during the incident on January 25 she told General Manager that she believed Owner was trying to force her into quitting but that she was "**not quitting**." (3/14/19 Hearing Transcript at 20 (emphasis added).) Claimant's testimony at the first

15

hearing is supported by the video of the incident. On the video, Claimant specifically told General Manager that "**I do want to work here**." (4/1/19 Hearing Transcript at 11 (emphasis added).) Additionally, General Manager's own testimony reflects that during their conversation on January 25 Claimant stated "**I'm not leaving, I'm not quitting**." (3/14/19 Hearing Transcript at 9 (emphasis added).) Therefore, the record supports that Claimant did not have "a conscious intention to leave [her] employment" with Employer because she told General Manager that she did not want to quit and that she wanted to continue to work for Employer. *Procyson*, 4 A.3d at 1127.

As such, we cannot agree, as Employer suggests, that the present matter is similar to *Miller* or *Yasgur*. As we observed in *Maines*,

> In *Miller*, the claimant returned from a day off due to illness and was asked by her superior why she was absent. The claimant stated: "[i]t doesn't matter, I won't be here much longer anyway", and her superior responded: "[y]ou can leave now." Similarly in *Yasgur*, the claimant's work was criticized by his employer after which the claimant announced that he was leaving. The employer replied: "[i]f this is what you want, then go." In both of those cases, the [C]ourt held that the employers' words did not possess the immediacy and finality of discharge and that the claimants therein were not compelled to leave but did so on their own motion.

*Maines*, 532 A.2d at 1251 (citations omitted). Here, unlike in *Miller* and *Yasgur*, Claimant did not express a desire to leave her job with Employer. Additionally, unlike the employers in *Miller* and *Yasgur*, Employer here did express "the immediacy and finality of discharge" when General Manager told Claimant that if she did not sign the disciplinary form she would not be permitted to work.

Further, we are not persuaded by Employer's arguments that Claimant, like the claimants in *Miller* and *Yasgur*, voluntarily quit her job because Claimant

16

"effectively walked off the job" "and did not come back to work." (Employer's Br. at 17.) Employer's assertion that "[i]nstead of waiting in the parking lot to speak with [Owner], as she was instructed, [Claimant] left the premises and failed to return" to work is not supported by the record. (*Id.*) The Board found that Claimant was **permitted** "to wait outside in her car to discuss the matter with the [O]wner, who hadn't arrived yet." (Board Opinion, FOF ¶ 6.) Conversely, Employer asserts that Claimant was **instructed** to wait for Owner and because she left before Owner arrived, she essentially walked off the job. Employer's factual assertion is not supported by its own General Manager's testimony, who testified as follows:

> [Claimant] said where's [Owner]? I said, well, [Owner] is on his way in. She said, well I want to talk to him. I said well, fine. . . . I had to call the Marple Township Police Department, and I said to them, I said she said she wants to wait for the [O]wner, she's **perfectly welcome to go wait in her car**.

(3/14/19 Hearing Transcript at 9 (emphasis added).) Therefore, the record does not support Employer's factual assertion that Claimant was **instructed** to wait for Owner and does support the Board's finding that she was **permitted** to do so. We, therefore, cannot agree with Employer that Claimant walked off the job by not waiting for Owner.

For the foregoing reasons, we cannot conclude that the Board committed an error of law in finding that Claimant was discharged by Employer. We must next examine whether Claimant was discharged for insubordination or willful misconduct for refusing to sign the disciplinary form, which would render her ineligible for UC benefits under Section 402(e). Employer only asserts that "[t]he initial Referee decision was correct in finding that the [Claimant] failed to show good cause for her acts of insubordination under 402(e)" in the "summary of argument" section of its

17

brief, (Employer's Br. at 11), and does not argue or provide a legal basis to support its assertion that Claimant committed an act of insubordination and that the Board erred by finding otherwise. As such, Employer has waived any arguments with respect to the Board's finding regarding Employer's lack of proof of insubordination. Pennsylvania Rule of Appellate Procedure 2119(a), Pa.R.A.P. 2119(a); *see also In re Condemnation of Land for S.E. Cent. Bus. Dist. Redevelopment Area No. 1 (405 Madison St., City of Chester)*, 946 A.2d 1154, 1156 (Pa. Cmwlth. 2008) ("Arguments not properly developed in a brief will be deemed waived"). Therefore, the Board's conclusion that Employer failed to demonstrate that Claimant's termination was due to insubordination/misconduct is conclusive on appeal.[5]

## III.  Conclusion

Accordingly, for the reasons set forth above, we affirm the Board's Order dated June 21, 2019, reversing the Referee's decision and granting Claimant UC benefits.

---

**RENÉE COHN JUBELIRER,** Judge

---

[5] If we addressed this argument, based on the facts as found by the Board, which are supported by substantial evidence, we would conclude Employer did not prove insubordination justifying termination by Claimant for refusing to sign the form as requested.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Advanced Mold Diagnostics, LLC,  :
                      Petitioner  :
                                  :
              v.                  :  No. 908 C.D. 2019
                                  :
Unemployment Compensation Board   :
of Review,                        :
                      Respondent  :

# **O R D E R**

    **NOW**, February 28, 2020, the Order of the Unemployment Compensation Board of Review dated June 21, 2019, is hereby **AFFIRMED**.

_____
**RENÉE COHN JUBELIRER,** Judge