# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Antoinette Myers, : 
                Petitioner : 
                 : 
          v. :   No. 474 C.D. 2020
                 :   Submitted: November 20, 2020
Unemployment Compensation : 
Board of Review, : 
              Respondent : 

BEFORE:  HONORABLE RENÉE COHN JUBELIRER, Judge
             HONORABLE P. KEVIN BROBSON, Judge[1]
             HONORABLE CHRISTINE FIZZANO CANNON, Judge

*OPINION NOT REPORTED*

**MEMORANDUM OPINION**
**BY JUDGE BROBSON**          **FILED: February 25, 2021**

Petitioner Antoinette Myers (Claimant) petitions, *pro se*, for review of an order of the Unemployment Compensation Board of Review (Board). The Board affirmed a decision of the Unemployment Compensation Referee (Referee), thereby denying Claimant unemployment compensation benefits pursuant to Section 402(b) of the Unemployment Compensation Law (Law),[2] relating to voluntary separation from employment without cause of a necessitous and compelling nature. For the reasons set forth below, we affirm.

---

[1] This case was assigned to the opinion writer before January 4, 2021, when Judge Brobson became President Judge.

[2] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 802(b).

Claimant filed a claim for unemployment compensation benefits following her separation from employment with her employer, Aveanna Healthcare LLC (Employer). (Certified Record (C.R.), Item No. 2.) The Altoona UC Service Center (Service Center) determined Claimant to be ineligible for benefits, because, although she had a necessitous and compelling reason for quitting, she did not exhaust all alternatives available to resolve the situation with Employer before doing so. (C.R., Item No. 5.) Claimant appealed, and a Referee conducted a hearing at which Claimant testified on her own behalf and Courtney Liptock (Liptock), Employer's Executive Director, testified on behalf of Employer. (C.R., Item Nos. 6, 9 at 1.)

At the hearing, Claimant testified that she began work for Employer as a quality assurance nurse on May 12, 2012, and that the last day she worked was May 6, 2019. (C.R., Item No. 9 at 3.) When asked to explain why she was no longer working for Employer, Claimant stated that she was terminated for no reason and that she received a termination notice effective May 14, 2019. (*Id.* at 4.)

Of particular importance herein, we note that Claimant suffered an injury to her right knee in 2014, which had been the source of an ongoing workers' compensation dispute with Employer. (*Id.* at 4, 6-8, 11, 15-18.) Claimant testified that she suffered a medical emergency, unrelated to her right knee injury, and was out of work from April 24, 2019, through May 5, 2019. (*Id.* at 4, 6.) When she returned to work on May 6, 2019, Claimant was told by Employer that her doctor's note was inadequate, so Employer gave her an additional form to be filled out by the emergency room doctor who treated her. (*Id.* at 4-5.)

Claimant testified that she did not return to work with Employer until after an appointment with her workers' compensation doctor on May 13, 2019. (C.R., Item Nos. 6 at 9-11, 9 at 6.) At that appointment, Claimant explained to her

doctor that her duties were becoming too much, she had been working in pain, and she refused to continue to do so. (C.R., Item No. 9 at 6.) Claimant told her doctor that Employer refused to pay for her knee brace, medications, a stool, or a standing desk, all things that would assist her in staying at work and doing her job. (*Id.* at 6-7.) Claimant testified that her doctor agreed to take her out of work for two weeks, at which point she should be reevaluated. (*Id.* at 8.)

Following her doctor's appointment on May 13, 2019, Claimant went into work and presented Employer with her doctor's note from her previous emergency room visit, dated May 8, 2019. (C.R., Item No. 9 at 8.) She then walked into Liptock's office and handed Liptock her laptop and tablet. (*Id.*) Claimant explained their interaction as follows:

> I did not trust [Liptock] with the information [regarding her May 13th doctor's appointment]. I just – that's just the truth. [Liptock] has not proven to be an honest person, in my sight. So, I did not trust her with the information. So, what I did tell her, when I walked into her office, I had in my hand, my laptop and my tablet, which I use for work. I handed that to her. She said to me, aren't you going to need these? My response was my attorney's [sic] will be in touch. That was the end of the conversation about why I handed her the laptop and the tablet. Anything beyond that is a fabrication. Before I totally departed her office, I think I got, maybe, a step through the doorway, I did turn back and say to her, I didn't get paid last week, when I was in the hospital. So I'm going to need to be paid for that. That was the end of our interaction. I went to my desk, gathered my things, and I left. My doctor assured me that he would send the note – the doctor's note to [Employer].

(*Id.*)

When questioned further by the Referee, Claimant admitted that she also left her keys in her desk and that her plan, which she failed to tell anyone at work that day, was not to return until she could negotiate different job modifications through

3

her attorney. (C.R., Item No. 9 at 15.) On cross-examination, Claimant admitted she "was not forthcoming" with Employer because she "was not comfortable with giving [Liptock] the information." (*Id.* at 20.) Claimant explained that the only people she saw when she went to work on May 13, 2019, were Liptock and Eric,[3] that everyone else was in a meeting, and that she did not want to interrupt the meeting to explain what was going on. (*Id.*) She testified that she did not talk to Eric about it because Eric was on his way to the meeting. (*Id.*)

Claimant testified that she did not have a note from her doctor with her when she went to Employer on May 13, 2019, because "[i]t had to be typed up and all of that." (*Id.* at 8.) Claimant's understanding when she left her doctor's office was that the doctor was going to send a note to Employer. (*Id.*) Claimant testified that her doctor later told her he faxed the note to Employer and that Claimant called Employer's office to confirm that it was received. (*Id.* at 9-10, 18.) Claimant admitted she did not tell Employer that her doctor took her out of work or that she would return to Employer in two weeks, and that she just wanted to deal with her attorney due to the "trust issue." (*Id.* at 8-10, 12.) Claimant further admitted that she left work that day without telling anyone when she would be back or what was going on with her medical condition, just that her "attorney would be in touch." (*Id.* at 13.)

Claimant testified that she received a "termination notice" through Employer's "Workday" system on May 14 or 15, 2019. (C.R. Item No. 9 at 4, 8-9, 19.) She forwarded the termination notice to her attorney, but she admittedly did not reach out to Employer to find out why she received the notice. (*Id.* at 13.)

---

[3] The individual named "Eric" is not fully identified in the transcript or elsewhere in the certified record, other than Liptock stating that he was her "leadership" at Employer. (C.R., Item No. 9 at 26.)

4

Claimant further stated that she received a "retraction" from Employer in December 2019, explaining that her employment was not terminated. (*Id.* at 10.) While Claimant testified that she repeatedly asked to return to work through her attorney and that Employer refused these requests, Claimant did not have any paperwork supporting this assertion and was not represented at the hearing. (*Id.* at 14, 17.)

Liptock then testified on behalf of Employer, essentially confirming Claimant's version of events leading up to the separation. (*See* C.R., Item No. 9 at 20-21.) Liptock testified that on May 13, 2019, Claimant came into her office with her laptop and other device, told Liptock it was her last day and that her attorney would be contacting Employer, and that was the end of the conversation. (*Id.* at 21.) Liptock interpreted Claimant's actions and statements as meaning "she would be resigning from the company." (*Id.*) Liptock stated that at no time prior to the date of her testimony had she seen the note provided by Claimant's doctor taking Claimant out of work as of May 13, 2019. (*Id.* at 22.) Moreover, to Liptock's knowledge, Employer never received any documentation that Claimant would be out of work for that two-week time period. (*Id.* at 23.)

As for the "termination notice" Claimant stated she received, Liptock testified that it was a document generated from Employer's internal "Workday" system and that it did not reflect that Claimant's employment was actually terminated: "It's just terminated from our system. So, it doesn't represent someone being terminated or not. It's just them being taken out of our system." (C.R., Item No. 9 at 21.) Liptock explained that despite the use of the word "terminated" on that particular document, Claimant was processed in Employer's system as a voluntary resignation. (*Id*. at 21-22, 26.) Liptock testified that, as of May 13, 2019, and ongoing, there was

5

work available within the parameters that had been set for Claimant. (*Id.* at 23.) She also testified that Employer sent Claimant a letter to that effect on June 4, 2019,[4] stating that Claimant was not fired and that her position was still available if she would like to return. (*Id.*) Employer never received a response from Claimant regarding this letter. (*Id.* at 23-24.)

The Referee issued a decision on February 24, 2020, affirming the Service Center's determination and denying benefits. (C.R., Item No. 10.) In so doing, the Referee made the following findings of fact:

1. []Claimant was employed as a Quality Assurance Nurse with [Employer] from May 12, 2012[,] through May 6, 2019 . . . .

2. As a result of an earlier medical issue, Claimant had modified work duties including no lifting, pushing[,] or pulling over ten pounds, and the opportunity to get up occasionally and move around.

3. Claimant was off work from April 24, 2019[,] until she was released to return to work with the same prior limitations effective May 6, 2019.

4. Claimant provided [] Employer with the return to work [paperwork], and was told the paperwork needed to be completed by the original emergency room doctor that treated her.

5. Claimant was scheduled off for personal reasons through May 13, 2019, but complied with [] Employer's instructions and was able to have the medical documents completed on May 8, 2019.

6. On May 13, 2019, [] Claimant saw her physician for continuing knee pain from the prior medical situation, and was placed out of work as of May 13, 2019[,] with a doctor follow[-]up appointment in two weeks.

7. On that same day[,] May 13, 2019, [] Claimant provided the corrected medical release form for her time off beginning April 24, 2019.

---

[4] Liptock explained that this was the letter Claimant referred to as the one in which Employer "retracted" her termination. (C.R., Item No. 9 at 23.) Liptock testified that Employer first sent this letter to Claimant on June 4, 2019, and when she did not reply, Employer sent the exact same letter to her again on December 19, 2019. (*Id.*) We note that while a copy of the letter dated December 19, 2019, is contained in the certified record, a copy of the letter dated June 4, 2019, is not. (C.R., Item No. 4 at 5.)

8. Claimant did not inform [] Employer that she had been put out of work for her knee effective May 13, 2019[,] and ongoing, as she was under the impression her physician was going to provide that information to [] Employer.

9. The medical documentation of [] Claimant's physician visit on May 13, 2019[,] shows that a copy of the medical information was provided to [] Claimant's attorney.

10. On May 13, 2019, [] Claimant also turned in her laptop and tablet to the Executive Director of [Employer, Liptock], with no explanation, simply indicating her attorney would be in touch.

11. [] Employer did not receive the medical information from May 13, 2019, and [] Claimant never followed up with Employer.

12. On May 15, 2019, [] Claimant received an email from [] Employer showing that she had been terminated out of the system effective May 14, 2019.

13. Based on [] Claimant's actions on May 13, 2019, and never receiving any indication as to why she had not continued reporting to work after providing Employer with the medical release, [] Employer assumed [] Claimant had resigned from her position.

14. Continuing work was available to [] Claimant at the time, and on June 4, 2019[,] [] Employer reached out to [] Claimant about returning to work but received no response.

(*Id.* at 1-2.)

The Referee denied benefits pursuant to Section 402(b) of the Law, because Claimant failed to prove that she had a necessitous and compelling reason for leaving her employment. (*Id.* at 3.) The Referee reasoned that while Claimant had valid reasons to be out of work based on her doctor's medical advice, she chose not to inform Employer of the situation and did not provide Employer with any written documentation from her physician. (*Id.*) In addition, the Referee stated that "[a]s Claimant's only comments when she turned in her laptop and tablet were that [] Employer will be hearing from her attorney, and Claimant failed to return to work, Employer assumed she had voluntarily resigned, and subsequently terminated her from their [sic] system, which is what [] Claimant saw in an email on May 15, 2019."

7

(*Id.*)  Given her actions, the Referee found that Claimant did not act with ordinary common sense or make a good faith effort to preserve her employment.  (*Id.*)  The Referee, therefore, affirmed the Service Center's determination.

Claimant appealed to the Board.  (C.R., Item No. 11.)  On April 17, 2020, the Board adopted the Referee's findings of fact and conclusions of law and affirmed the Referee's decision, denying benefits.  (C.R., Item No. 12.)  In doing so, the Board resolved the conflicts in the testimony in favor of Employer and found the testimony of Liptock to be credible.  (*Id.*)  On April 25, 2020, Claimant petitioned the Board for reconsideration of its decision.  (C.R., Item No. 13.)  Her petition was deemed denied when the Board failed to rule on it within the applicable timeframe.[5] Claimant now petitions this Court for review of the Board's April 17, 2020 order.

On appeal,[6] Claimant appears to argue the following:  (1) the Board's findings of fact are not supported by substantial evidence; (2) the Board erred in concluding that she voluntarily quit her employment as opposed to having been discharged; and (3) alternatively, if the Court concludes that Claimant voluntarily quit her employment, the Board erred in concluding that she failed to establish cause of a necessitous and compelling nature to quit.

As to her substantial evidence argument, Claimant does not identify any specific factual findings that are not supported by substantial evidence, but it is evident that she takes issue with the findings concerning whether she informed Employer regarding her May 13, 2019 doctor's note, excusing her from work for two weeks.  Despite Claimant's arguments to the contrary, the Board did not ignore

---

[5] *See* Section 35.241(d), (e) of the General Rules of Administrative Practice and Procedure, 1 Pa. Code § 35.241(d), (e).

[6] This Court's standard of review is limited to determining whether constitutional rights were violated, whether an error of law was committed, or whether necessary findings of fact are supported by substantial evidence.  2 Pa. C.S. § 704.

8

the proffered evidence; rather, it resolved the conflict with respect to that evidence in favor of Employer. The Board's determination specifically states that "[C]laimant also argues that [] [E]mployer received a doctor's note via fax, but [Liptock] testified to the contrary." (C.R., Item No. 12 at 1.) The Board then resolved all conflicts in the testimony in favor of Employer and found Liptock to be credible. The Board is the ultimate factfinder and is entitled to make its own determinations as to witness credibility and evidentiary weight, as well as to resolve conflicts in the evidence. *Peak v. Unemployment Comp. Bd. of Rev.*, 501 A.2d 1383, 1388-89 (Pa. 1985); *DeRiggi v. Unemployment Comp. Bd. of Rev.*, 856 A.2d 253, 255 (Pa. Cmwlth. 2004). When the Board's findings are supported by substantial evidence,[7] they are conclusive on appeal. *Henderson*, 77 A.3d at 718. Claimant is essentially asking this Court to overturn the Board's credibility and evidentiary weight determinations, which we cannot do based on the record before us.

As to Claimant's argument that the Board erred in concluding that she voluntarily quit her employment, Claimant contends that Employer's termination of her employment is evidenced by the termination notice she received on May 15, 2019. The Board argues that Claimant failed to prove that she was fired; rather, Claimant's actions in telling Liptock that it was her last day, returning her laptop and tablet, and failing to notify Employer that her doctor took her out of work demonstrate Claimant's intent to resign. The Board maintains that any confusion generated by Employer's "termination notice" was rectified through Employer's June 4, 2019 correspondence to Claimant.

---

[7] Substantial evidence has been "defined as relevant evidence upon which a reasonable mind could base a conclusion." *Henderson v. Unemployment Comp. Bd. of Rev.*, 77 A.3d 699, 718 (Pa. Cmwlth. 2013).

To be eligible for unemployment compensation benefits, a "claimant bears the burden of proving separation from employment, whether voluntary or involuntary." *Watkins v. Unemployment Comp. Bd. of Rev.*, 65 A.3d 999, 1004 (Pa. Cmwlth. 2013). As this Court has explained,

> [w]hether a claimant's separation from employment is the result of a voluntary action or a discharge is a question of law subject to review by this Court and must be determined from a totality of the facts surrounding the cessation of employment. A claimant seeking unemployment compensation benefits bears the burden of establishing either that (1) [her] separation from employment was involuntary or (2) [her] separation was voluntary but [she] had cause of a necessitous or compelling nature that led [her] to discontinue the relationship.

*Greenray Indus. v. Unemployment Comp. Bd. of Rev.*, 135 A.3d 1140, 1143 (Pa. Cmwlth. 2016) (quoting *Watkins*, 65 A.3d at 1004).

To be interpreted as involuntary, meaning a discharge, "the employer's language must possess the immediacy and finality of a firing." *Watkins*, 65 A.3d at 1004 (citing *Charles v. Unemployment Comp. Bd. of Rev.*, 552 A.2d 727, 729 (Pa. Cmwlth. 1989)). As for the claimant's side of the equation, it is well established that "[a]n express resignation is not necessary to constitute a voluntary termination; conduct which is tantamount to a voluntary termination of employment is sufficient." *Greenray Indus.*, 135 A.3d at 1143 (quotations omitted) (quoting *Shrum v. Unemployment Comp. Bd. of Rev.*, 690 A.2d 796, 799-800 (Pa. Cmwlth. 1997)). A voluntary termination, however, "requires a finding that the claimant had a conscious intention to leave employment" based upon "the totality of the circumstances surrounding the incident." *Procyson v. Unemployment Comp. Bd. of Rev.*, 4 A.3d 1124, 1127 (Pa. Cmwlth. 2010) (quotations omitted) (citing *Fekos Enters. v. Unemployment Comp. Bd. of Rev.*, 776 A.2d 1018, 1021 (Pa. Cmwlth. 2001)).

Here, the totality of the circumstances supports the Board's determination that Claimant voluntarily quit. The Board found that, on May 13, 2019, Claimant turned in a return to work form from a previous absence, and then handed her laptop and tablet to Liptock and stated that her attorney would be in touch. Claimant then went to her desk, gathered her things, left her keys on the desk, and left the building without any explanation whatsoever. Claimant admittedly did not attempt to explain to anyone at Employer, either on May 13, 2019, or at any time thereafter, that her doctor had written her out of work or when/if she may return. Moreover, Claimant received correspondence from Employer dated June 4, 2019, and December 19, 2019, stating that continuing work was available if she wished to return. Claimant, however, never responded to either correspondence. This Court has held that a claimant "who leaves her employment without informing her employer when or if she is planning to return[] may be held to have voluntarily quit." *Iaconelli v. Unemployment Comp. Bd. of Rev.*, 892 A.2d 894, 896 (Pa. Cmwlth. 2006). This is especially true where, as here, a reasonable period of time has passed "in which [the claimant] ha[d] the opportunity to manifest an intent to quit and the employer ha[d] the opportunity to contact the [claimant] or vice-versa." *Id.* (citing *Ryan v. Unemployment Comp. Bd. of Rev.*, 448 A.2d 713 (Pa. Cmwlth. 1982)).

Finally, as to Claimant's alternative argument that the Board erred in concluding that she failed to establish cause of a necessitous and compelling nature to quit, we acknowledge that a claimant's "medical condition or health reason may create cause of a necessitous and compelling nature to terminate (or leave) employment voluntarily." *Watkins*, 65 A.3d at 1004 (citing *Deiss v. Unemployment Comp. Bd. of Rev.*, 381 A.2d 132 (Pa. 1977)). The underlying medical condition or

11

health reason, however, is only relevant if the claimant demonstrates, through competent and credible evidence, that she informed the employer of her health problems. *Watkins*, 65 A.3d at 1004-05. Again, here, the Board found credible Liptock's testimony that she had never seen Claimant's doctor's note prior to the hearing before the Referee, and that, to her knowledge, Employer never received anything taking Claimant out of work beginning May 13, 2019. Claimant herself admitted that she was not forthcoming with Employer about the issue, and that she did not discuss it with anyone at Employer on May 13, 2019, or anytime thereafter. She simply handed over her work items and left without any explanation or indication of when, or if, she would return. For all of these reasons, the Board did not err in determining that Claimant failed to demonstrate cause of a necessitous and compelling nature for leaving her employment.

Accordingly, the order of the Board is affirmed.[8]

P. KEVIN BROBSON, Judge

---

[8] We note that Claimant attached to her brief a written statement purportedly from her workers' compensation attorney. (*See* Pet'r's Br. at 17.) This Court, however, cannot consider evidence that was not part of the record before the Board. *See Croft v. Unemployment Comp. Bd. of Rev.*, 662 A.2d 24, 28 (Pa. Cmwlth. 1995) ("This Court may not consider auxiliary information appended to a brief that is not part of the certified record."). For this reason, we have not considered the statement attached to Claimant's brief in our review of this matter.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Antoinette Myers,                           :
                    Petitioner              :
                                            :
        v.                                  :    No. 474 C.D. 2020
                                            :
Unemployment Compensation                   :
Board of Review,                            :
                    Respondent              :

# **O R D E R**

AND NOW, this 25th day of February, 2021, the order of the Unemployment Compensation Board of Review is AFFIRMED.

_____
P. KEVIN BROBSON, Judge